855 F.Supp. 1049 (1994)
COPELCO LEASING CORPORATION, Plaintiff,
v.
Edward L. EYERMAN, M.D. and Man Mohan Gursahani, M.D., Defendants.
No. 4:93CV616SNL.
United States District Court, E.D. Missouri, Eastern Division.
June 22, 1994.
*1050 *1051 Michael P. Stephens, Associate, St. Louis, MO, for plaintiff Copelco Leasing Corp.
John F. Cowling, Armstrong and Teasdale, Leonard D. Vines, Partner, Vines and Ross, Pat L. Simons, St. Louis, MO, for defendant Edward L. Eyerman, M.D.
Leonard J. Frankel, of counsel, Vines and Ross, Leonard D. Vines, Partner, Pat L. Simons, St. Louis, MO, for defendant Man Mohan Gursahani, M.D.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff has filed a three-count complaint seeking damages for the defendants' alleged default regarding a medical equipment lease. Count I seeks damages for breach of contract; Count II seeks damages for breach of guaranty; and Count III seeks an Order of Delivery (for the United States Marshal) for repossession of the equipment in question.[1] This matter is before the Court on defendant Eyerman's motion for summary judgment (# 43), filed August 2, 1993; defendant Gursahani's motion for summary judgment (# 44), filed August 3, 1993; and plaintiff's motion for summary judgment (# 59), filed October 19, 1993. Extensive responsive pleadings have been filed with regard to all three motions. This cause of action is set for trial on the Court's non-jury trial docket of August 22, 1994.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing *1052 that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts.[2]
During the summer of 1992, defendants, together with David Rines and other individuals, entered into a business relationship with the intention of obtaining a mobile lithotripter to provide services to hospitals both in Missouri and other states. A lithotripter is a piece of medical equipment designed to break up or dissolve kidney stones through the transmission of concentrated ultrasonic energy waves. A lithotripter may be installed permanently in a hospital or it can be housed in a van or on a trailer and moved from hospital to hospital.
A suitable mobile lithotripter was located at the University of North Carolina Hospital.[3] A rather complex financing arrangement was then initiated among several parties, including the plaintiff and the defendants.
On July 27, 1992 a Master Lease Purchase Agreement was executed between plaintiff and Century Financial Services (CFS) regarding the assignment of various leases. Pursuant to the Agreement, in return for funding, CFS would assign to Copelco the right to the income or rental stream from (later) specified lease, while CFS maintained the ownership interest in the specified lease and was the legal owner of the equipment. Copelco would maintain a lien and lienholder status on the leased equipment and would be referenced as lienholder on the relevant documents. Defendant Eyerman's Reply in Support of Motion for Summary Judgment (# 53), Exhibit 4.
On August 4, 1992 CFS submitted a lease proposal to the defendants. The cover letter attached to the proposal informed the defendants that CFS was presenting "our preliminary proposal" which if "the terms are mutually satisfactory" would be incorporated into a final document to be executed by the parties. The cover letter further informed the defendants that the preliminary proposal was subject to final approval by CFS's Senior Management Committee. Plaintiff's Motion for Summary Judgment (# 59), Exhibit 13. The proposal itself is captioned LEASE PROPOSAL. It is a lease proposal for a 51 months lease with a 90 day deferred payment. At the bottom of the lease proposal is the following disclaimer:
THE PROVISIONS OF THIS LEASE PROPOSAL DO NOT AND SHALL NOT BE INTERPRETED TO CONSTITUTE A COMMITMENT BY CFS TO ACCEPT THIS TRANSACTION.
The document is signed by both defendants and dated August 5, 1992. Plaintiff's Motion for Summary Judgment (# 59), Exhibit 13.
On October 1, 1992 CFS and the defendants executed a lease for the subject lithotripter. Memorandum of Plaintiff in Opposition to Defendants' Motions for Summary Judgment (# 50), Exhibit 9. This is an *1053 equipment lease with a 48 months term, and no 90 day deferred payment. It lists Access Medical Equipment Group as the equipment supplier, both defendants as the lessees (co-lessees jointly and severally responsible) and CFS as the lessor. The terms and conditions of the lease, include but not limited to, the following:
2.(g). LESSEE SHALL HAVE NO REMEDY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES AGAINST LESSOR ...
3. SELECTION OF EQUIPMENT  STATUTORY FINANCE LEASE
This is a finance lease as defined under Section 2A of the Uniform Commercial Code.
(A) Lessee has selected both (1) the Equipment and (2) the supplier from whom the Lessor is to purchase the Equipment for lease to Lessee ... Lessee acknowledges that Lessor has provided Lessee with a copy of the contract evidencing Lessor's purchase of the Equipment and that Lessee's acceptance of the Equipment was not induced by any assurances of Lessor.
(B) LESSEE WAIVES ANY AND ALL RIGHTS AND REMEDIES WHICH MAY BE GRANTED LESSEE BY ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE TO THE EXTENT SUCH RIGHTS ARE INCONSISTENT WITH THE EXPRESS TERMS AND CONDITIONS OF THIS LEASE.
14. INSURANCE; LIENS; TAXES.
Lessee shall keep the equipment free and clear of all levies, liens, and encumbrances. Lessee shall pay all charges and taxes (local, state, and federal) which may now or hereafter be imposed upon the ownership, leasing, rental, sale, purchase, possession or use of the Equipment, excluding, however, all taxes on or measured by Lessor's net income.
16. ASSIGNMENT. WITHOUT LESSOR'S PRIOR WRITTEN CONSENT, LESSEE SHALL NOT ASSIGN THIS LEASE OR SUBLEASE THE EQUIPMENT COVERED HEREBY, OR PLEDGE OR OTHERWISE DISPOSE OF THIS LEASE OR THE EQUIPMENT COVERED HEREBY, OR ANY INTEREST THEREIN.
ANY ASSIGNEE OR LESSOR SHALL HAVE ALL OF THE RIGHTS BUT NONE OF THE OBLIGATIONS OF LESSOR UNDER THIS LEASE. LESSEE SHALL RECOGNIZE AND HEREBY CONSENTS TO ANY ASSIGNMENT OF THIS LEASE BY LESSOR AND SHALL NOT ASSERT AGAINST THE ASSIGNEE ANY DEFENSE, COUNTERCLAIM OR SET-OFF THAT LESSEE MAY HAVE AGAINST LESSOR, SUBJECT TO THE FOREGOING ...
23. CHOICE OF LAW. This lease shall not be effective until signed by Lessor in its office in St. Louis, Missouri. This lease shall be considered to have been made in the State of Missouri and shall be interpreted in accordance with the laws and regulations of the State of Missouri.
Lessee hereby consents to the jurisdiction of the Courts of the State of Missouri and of the United States District Court for the Eastern District of Missouri in connection with any cause of action, suit, or proceeding brought to enforce the terms of this Lease or otherwise arising under this Lease. Lessee concedes that by entering into this lease transaction, Lessee has transacted business in the State of Missouri and specifically in St. Louis, Missouri and that venue of any action brought to enforce this Lease may be had in St. Louis County, Missouri.
25. ENTIRE AGREEMENT; WAIVER. This instrument constitutes the entire agreement between the Lessee and Lessor. No provision of this Lease shall be modified unless in writing signed by an authorized representative of Lessor. Waiver by Lessor of any provision hereof in one instance shall not constitute a waiver as to any other instance.
Both defendants signed and dated the Lease as of October 1, 1992. Both defendants' signatures are witnessed by R. David Rines. The Lease is signed and dated by John M. Mock, President of CFS, as of October 6, 1992. Simultaneous with the signing of the lease, both defendants executed an Equipment *1054 Lease Guaranty. Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment (# 50), Exhibit 9. The guaranty states, in relevant part:
"NOW, THEREFORE, in order to induce Lessor to enter into the above-referenced Lease with Lessee, Guarantory, jointly and severally, unconditionally guaranties the faithful and full performance by Lessee of all terms and conditions required of Lessee under the Lease.
---------
Guarantor waives any defense arising by reason of any disability or any other defense of Lessee, or by reason of the cessation, from any cause whatsoever, the liability of Lessee under said Lease."
Contemporaneous with the signing of the Lease, both defendants signed an OPTION TO PURCHASE LEASED EQUIPMENT. Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment (# 50), Exhibit 10. Finally, on October 1, 1992, CFS executed a purchase order to Access Medical Equipment Group for the subject lithotripter with a purchase price of $399,000.00. The subject lease is referenced, as well as the defendants as the lessees, on this purchase order. Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment (# 50), Exhibit 17.
On or about October 6, 1992 CFS executed an Assignment of the rental stream on the subject lease to the plaintiff Copelco. Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment (# 50), Exhibit 11. On October 21, 1992 both defendants executed an ACKNOWLEDGEMENT AND ACCEPTANCE OF DELIVERY BY LESSEE. Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment (# 50), Exhibit 12. This acknowledgement and acceptance form clearly identifies the lessees as the defendants, the lessor as CFS, and the subject leased lithotripter. It further states that the lessees, on October 21, 1992, acknowledge receipt and acceptance of the lithotripter; that it is in satisfactory condition, and has been properly installed.
On October 22, 1992, at plaintiff's offices in New Jersey, the closing on the deal was completed. The University of North Carolina sold the subject lithotripter to Access Medical Equipment Group for the sum of $300,000.00. Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment, Exhibit 14 (copies of the Bill of Sale from UNC to Access and the check in payment thereof). Contemporaneous with this sale, UNC presented the original Certificate of Title. Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment, Exhibit 20. UNC endorsed the Assignment of Title on the reverse side to the defendants. The defendants' unnotarized signatures are at the bottom of the assignment of title. Access then sold the subject lithotripter to CFS for the sum of $399,000.00. The $399,000.00 purchase price was actually paid by plaintiff because plaintiff was funding the transaction between CFS and Access. Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment, Exhibit 18. Plaintiff also issued a check to CFS in the amount of $15,867.69 for CFS's discounting fee. Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment, Exhibit 19.
Following the closing, plaintiff forwarded the original Certificate of Title, Title Application (Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment, Exhibit 22), and necessary fees to the Missouri Department of Revenue in order to obtain a new title. The Title Application has the defendants' signatures at the bottom. On or about April 15, 1993 the Missouri Department of Revenue rejected the title application as being illegible. The rejected title application was returned to the defendants. On it is stamped ATTN: 301.190 and a post-it sticker which states: ATTN: 301.190, Not paid sales tax. Memorandum in Support of Defendant Eyerman's Motion for Summary Judgment, Exhibit 6. Although it is unclear how the plaintiff became aware of the rejected title application, a corrected title application was forwarded to the Missouri Department of Revenue. Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment, Exhibit 24.
Pursuant to paragraph 5 of the Lease, the first payment was due to plaintiff from the *1055 defendants on or before November 22, 1992, and on the 22nd day of each and every month thereafter for the lease term. The defendants failed to make a payment on November 22, 1992; December 22, 1992; or January 22, 1993. Default, demand, and acceleration letters were sent to the defendants on January 28, 1993; February 12, 1993; and February 23, 1993. Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment, Exhibit 26. Defendants tendered two payments to the plaintiff: February 3, 1993 and February 17, 1993. Defendants have not made any further payments in accordance with the lease.
Meanwhile, plaintiff investigated into the status of the refiled title application. On February 10, 1993 plaintiff learned that the refiled title application had not yet been processed because the defendants had not completed certain paperwork and had not paid certain fees as required by the Missouri Department of Revenue.
On July 28, 1993 plaintiff repossessed the subject lithotripter from the defendants. On August 20, 1993 plaintiff applied to the Missouri Department of Revenue for a "repossessed title". Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment, Exhibits 28 and 29.
Plaintiff has filed its summary judgment motion contending that the subject lease is enforceable against the defendants as a valid lease, and that since there is no dispute that the defendants were in default of the lease, they are liable for damages as a matter of law. Plaintiff also contends that since the guaranty is also enforceable, and the defendants do not contest its validity, the defendants are liable as well under the guaranty as a matter of law. The defendants' motions for summary judgment basically argue the same position, i.e. that the sale of the lithotripter from UNC to Access, and then from Access to CFS did not comply with certain Missouri statutes, thus the sales were fraudulent and void. They contend that since the sales were void, CFS did not acquire any title or ownership rights in the lithotripter, and therefore could not assign any legal interest in the lease to the plaintiff, thus the plaintiff has no cause of action against the defendants. Defendant Eyerman has also filed a counterclaim of three counts alleging 1) lease is voidable because certain documents evidencing the purported sales were not furnished to the defendants; 2) the lease is voidable because its terms differ from the terms in the lease proposal; and 3) the lease is unconscionable under UCC § 400.21-108 because the afore-mentioned documents were not furnished to the defendants. Defendant Gursahani also argues that the lease is voidable because a Certificate of Need was never obtained by Access, CFS, or the plaintiff; and that he was "duped" into signing the lease and guaranty because he believed that he was only going to be a consultant to the lithotripter project.
Plaintiff contends that the subject lease is enforceable against the defendants because there is no dispute that the defendants signed the lease and guaranty, signed the acknowledgment and acceptance forms, had use and benefit of the lithotripter, and failed to make timely lease payments. Defendants respond (which is also the basis for their summary judgment motions) that the purported lease was void ab initio because plaintiff could acquire a lessor's rights only from the owner of the equipment, and CFS did not own the equipment because it had no title to the equipment prior to assigning rights to the plaintiff. Defendants contend that the prior sales of the equipment did not comply with Missouri Statutes §§ 301.210.4, 301.600, and 301.190. Plaintiff contends that since the sales took place in New Jersey, Missouri statutory law is inapplicable; however, even if Missouri statutory law is applicable, such law was followed.
In order to address in a coherent fashion the myriad of arguments presented by the parties in their motions, the Court suggests a two-step analysis. First, the Court must address the issue of whether or not Missouri statutory law governs the entire transaction or any part thereof; and if so, which statutes govern. Second, the Court must then take a close look at the subject lease and guaranty and determine whether there are any material facts in dispute as to the execution and/or performance of the lease by any of the parties; *1056 and whether the lease is enforceable as a matter of law.
Plaintiff contends that New Jersey law should govern the Court's inquiry into the sale(s) of the lithotripter; while the defendants contend that Missouri law should govern this inquiry. This issue must be addressed first since the resolution of the remaining issues are affected by this determination. "Federal district courts must apply the choice of law rules of the state in which they sit when jurisdiction is based on diversity of citizenship." Electrical and Magneto Service (EMS) v. AMBAC International, 941 F.2d. 660, 661 (8th Cir.1991) quoting Whirlpool Corp. v. Ritter, 929 F.2d. 1318, 1320 (8th Cir.1991). Missouri courts rely on the criteria contained in § 188, The Restatement of Conflicts (Second) when addressing choice-of-law issues in contract actions. EMS at 661; Frost v. Liberty Mutual Insurance Co., 828 S.W.2d. 915, 920 (Mo.App.1992). Under the Restatement, the contacts to be weighed and considered are 1) the place of the contract; 2) the place of negotiation of the contract; 3) the place of performance; 4) the location of the subject matter of the conflict; 5) the domicile, residence, nationality, place of incorporation and place of business of the parties. Frost v. Liberty Mutual, at 920.
The entire transaction regarding the subject lithotripter involved several parties negotiating different business deals in various places. However, after careful consideration of the aforementioned factors and the ultimate goal of the entire transaction, this Court determines that Missouri law should apply as the governing law for the entire transaction from start to finish.
The subject lithotripter was originally owned and titled in North Carolina to the University of North Carolina. Access Medical Equipment Group is a Pennsylvania corporation. Plaintiff Copelco is a New Jersey business entity. CFS is a Missouri business entity. The defendants are Missouri residents. The sale(s) of the lithotripter were closed at plaintiff's offices in New Jersey. The subject lease and guaranty were executed between Missouri residents in Missouri. At the time of the sale(s) of the lithotripter, it was in Missouri. The subject lease has a clear and specific choice-of-law provision mandating that all causes of actions to enforce the terms of the lease or arising under the lease will be litigated in the State of Missouri in accordance with Missouri law. The ultimate goal of the entire transaction was to lease the lithotripter to the defendants for use primarily in Missouri.
The instant lawsuit is a cause of action to enforce the terms of the lease (and guaranty). Although the sale(s) transactions have some effect on the outcome of this litigation, the primary focus of this litigation is the relationship between the parties as established under the subject lease and guaranty. Since there is no dispute as to the enforceability of the choice-of-law provision in the subject lease, this Court finds that Missouri law is applicable to the instant lawsuit in its entirety.
Defendants contend that the sale(s) of the lithotripter failed to comply with § 301.210 R.S.Mo. for two reasons: 1) the assignment of title to the defendants was not notarized; and 2) a new title was never issued in the State of Missouri. Plaintiff contends, that for several reasons, § 301.210 R.S.Mo. is inapplicable. However, if § 301.210 R.S.Mo. is applicable, the sale(s) did comply with same and the fact that a new title was never issued by the State of Missouri is immaterial. Although this entire transaction consisted of a somewhat convoluted series of transactions, the Court finds that § 301.210 R.S.Mo. is applicable, was complied with, and an assignment of title transpired, thus ownership interest did ultimately pass to CFS.
Plaintiff contends that § 301.210 R.S.Mo. does not apply in this case because the purpose of the statute is to inhibit trafficking in stolen automobiles; that the sale(s) and purchase(s) of the lithotripter did not occur in Missouri; and that the equipment in question does not constitute a "trailer" within the scope of the statute; that the equipment was not previously registered in Missouri; and that the equipment falls within a statutory exemption to the titling laws in Missouri.
Before delving into the murky waters of the various Missouri statutes involved in this case, the Court must first address an *1057 important threshold issue  the resolution of factual issues by this Court. The instant litigation is a non-jury case, i.e. it will (if necessary) be bench-tried. Although disputed issues of fact are normally left for the jury to decide, there will be no jury involved with the disposition of this case. This Court will be both the factfinder and the ultimate determinator of legal issues. The parties have spent a considerable amount of time submitting an avalanche of materials in support of and in opposition to the summary judgment motions. Any factual disputes can and will be resolved with the extensive record now before the Court.
Section 301.210 R.S.Mo. states in relevant part:
Sale and transfer of vehicles  assignment of certificate  new certificate  notice of sale to nonresident  director of revenue to keep file  other sales void
1. In the event of a sale or transfer of ownership of a motor vehicle or trailer for which a certificate of ownership has been issued, the holder of such certificate shall endorse on the same an assignment thereof, with warranty of title in form printed thereon, and prescribed by the director of revenue, with a statement of all liens or encumbrances on such motor vehicle or trailer, and deliver the same to the buyer at the time of the delivery to him of such motor vehicle or trailer.
2. The buyer shall then present such certificate, assigned as aforesaid, to the director of revenue, at the time of making application for the registration of such motor vehicle or trailer, whereupon a new certificate of ownership shall be issued to the buyer, the fee therefor being that prescribed in subsection 5 of section 301.190.
. . . . .
4. It shall be unlawful for any person to buy or sell any motor vehicle or trailer registered under the laws of this state, unless, at the time of the delivery thereof, there shall pass between the parties such certificates of ownership with an assignment thereof, as provided in this section, and the sale of any motor vehicle or trailer registered under the laws of this state, without assignment of such certificate of ownership, shall be fraudulent and void.
This Court has already decided that sales involved in this "occurred within the state" for the purposes of application of Missouri's titling laws.
Plaintiff then argues that the purpose of Section 301.210 is to thwart the trafficing of stolen automobiles. The Court agrees that this may have been the initial purpose of the statute, see, Fawley v. Bailey, 512 S.W.2d. 477, 479 (Mo.App.1974); however, this does not mean that the statute cannot be applied to the present situation if the equipment in question falls within the scope of the statute's language.
Section 301.010 provides definitions for terms, including but not limited to the following terms, as used in Chapter 300:
(38) "Owner", any person, firm, corporation or association, who holds the legal title to a vehicle or in the event a vehicle is the subject of an agreement for the conditional sale or lease thereof with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee or lessee, or in the event a mortgagor of a vehicle is entitled to possession, then such conditional vendee or lessee or mortgagor shall be deemed the owner for the purpose of this law ...
(49) "Special mobile equipment", every self-propelled vehicle not designed or used primarily for the transportation of persons or property and incidentally operated or moved over the highways, including farm equipment, implements of husbandry, road construction or maintenance machinery, ditch-digging apparatus, stone crushers, air compressors, power shovels, cranes, graders, rollers, well-drillers and woodsawing equipment used for hire, asphalt spreaders, bituminous mixers, bucket loaders, ditchers, leveling graders, finished machines, motor graders, road rollers, scarifiers, earth-moving carryalls, scrapers, drag lines, rock-drilling and earth moving equipment. This enumeration shall be deemed partial and shall not operate to exclude other such vehicles which are within the general terms of this section.

*1058 (54) "Trailer", any vehicle without motive power designed for carrying property or passengers on its own structure and for being drawn by a self-propelled vehicle, except those running exclusively on tracks, including a semi-trailer or vehicle of the trailer type so designed and used in conjunction with a self-propelled vehicle that a considerable part of its own weight rests upon and is carried by the towing vehicle. The term "trailer" shall not include cotton trailers as defined in subdivision (8) of this section and shall not include manufactured homes as defined in section 700.010 R.S.Mo.
Although the parties, as well as the Court, have consistently referred to the subject of the lease to be a "lithotripter", in actuality, the equipment leased was a "lithotripter unit", i.e. a Dornier lithotripter housed in a Miller transportable mobile suite. Although the lithotripter and mobile suite are separate components, there is no question that all of the parties involved in this transaction considered them as a single unit. On all documents evidencing the sales and the lease itself, the lithotripter and the mobile unit are described together as the "leased equipment". Although the State of North Carolina issued a title for the mobile suite only, which it did so as a "trailer", there is no dispute that at all time relevant to the transaction in question, that the lithotripter was housed in the mobile suite. Furthermore, at no time were the lithotripter and mobile suite ever sold as separate components, i.e. they were always sold and eventually leased as a single unit.
The Court has reviewed the pictures of the lithotripter unit (Reply in Support of Defendant Eyerman's Motion for Summary Judgment, Exhibit 2) and the definition of "trailer" pursuant to § 301.010(54) and finds that the lithotripter unit falls within the scope of the definition of "trailer". Furthermore, the Court finds that the lithotripter unit does not fall within the statutory definition of "special mobile equipment" for the undisputed fact that the lithotripter is not self-propelled.
Having determined that the lithotripter unit constitutes a "trailer" for purposes of § 301.210 R.S.Mo., the fact that the unit was titled originally in North Carolina does not alter the necessity of compliance with § 301.210 R.S.Mo. Fawley v. Bailey, at 479.
Defendants' basic argument is that neither of the sales of the lithotripter unit satisfied § 301.210, therefore no valid assignment of ownership interest was ever passed to CFS. Since no valid assignment of ownership interest ever passed to CFS, it could not pass any rights in the rental stream to the plaintiff. Defendants aver that the requirements of § 301.210 were not met because 1) UNC's purported assignment of the title certificate to the defendants was not duly notarized; and even if it had been, the assignment was ineffective because the defendants were not the purchasers of the lithotripter unit; and 2) Access' purported sale of the lithotripter unit to CFS did not include passing (to CFS) a notarized assignment of the lithotripter unit's certificate of ownership identifying CFS as the purchaser.
The Court finds the assignment of the certificate of title to the defendants to be valid and effective in passing ownership rights to CFS for several reasons. Firstly, § 301.210(1) says nothing about an assignment being notarized. In fact, the Missouri Court of Appeals, Eastern District recently addressed the issue of the notary requirement (with regard to § 301.210 R.S.Mo.) on the assignment of titles. American Economy Insurance Co. and American States Insurance Co. v. Iris M. Paul, et al., 872 S.W.2d. 496, (Mo.App.1994). After reviewing the judicial decision in Rodriquez v. General Accident Ins. Co. of America, 808 S.W.2d. 379 (Mo.1991) and the legislative history concerning the enactment of amended § 401.536 and § 303.025, the Court found that notarization of an assignment of a title of ownership was not required under Missouri law, and "the seller's failure to comply with the notary requirement [of § 301.210] should not operate to defeat the acquisition of either title or insurance coverage." American Economy Insurance Co., at 499.
As for the assignment of title listing the defendants instead of Access or CFS, the Court finds that this fact alone does not operate to defeat compliance with § 301.210 *1059 R.S.Mo. Section 301.210(1) simply requires that in situations involving a sale or transfer of ownership of a motor vehicle or (as in this case) a trailer for which a certificate of ownership has been issued (whether in Missouri or out-of-state), the holder of said certificate need only to endorse the assignment and deliver same to the buyer at the time of delivery of said motor vehicle or trailer. Section 301.210(1) does not stipulate as to whose name must be endorsed on the assignment, nor does it require that only the purchaser's name be endorsed on the assignment.
It is undisputed that Bills of Sale were passed between the parties involved in the two sale transactions, as well as checks in payment for the lithotripter. There is also no dispute that the certificate of ownership, albeit endorsed to the defendants, was delivered to Access, then delivered to CFS. All documents submitted by the plaintiff and the defendants show that the lithotripter unit was in Missouri at the time that the certificate of ownership was ultimately delivered to CFS. Finally, the defendants executed an Acknowledgement of Complete Performance whereby verifying that Access had complied with all conditions precedent to a satisfactory completion of the transaction resulting in the subject lease, and further directing CFS to make payment to Access for the leased equipment.
As for the assignment to the defendants, the Court finds no fatal flaw. Since § 301.210 does not specify to whom the holder of the title should endorse the assignment, it was reasonable for UNC to endorse the assignment to the defendants because they fall within the scope of the definition for "owner" applicable under Chapter 300. They were lessees with the right of purchase (having executed an Option to Purchase Leased Equipment) with an immediate right of possession. For purposes of compliance with the titling laws under Chapter 300, the defendants were the "owners" of the lithotripter unit.
Although admittedly the consummation of this entire deal was perhaps not done in the usual and ordinary manner, there is nothing before the Court to indicate that the parties involved in the transaction(s) did not comply with § 301.210 R.S.Mo. Contemporaneous with the delivery of the lithotripter unit into the State of Missouri (which the defendants have evidenced by signing the Acknowledgment and Acceptance of Delivery as of October 21, 1992), the certificate of ownership (title) with the assignment "pass[ed] between the parties", thus the sale(s) of the lithotripter unit are not fraudulent and void.
As for compliance with § 301.190, whether or not plaintiff mishandled the application for the issuance of a new Missouri certificate of title is irrelevant to the issue of whether the sale(s) of the lithotripter unit were fraudulent and void. Sections 301.190 and 301.210 govern different aspects of the title process in Missouri. As the plaintiff points out (and the defendants do not dispute) the acceptance or rejection (as in this case) of a title application is dependant upon compliance with § 301.190, not § 301.210.
Having found that § 301.210 was complied with and a proper assignment of title was made, ownership interest passed to CFS, which in turn properly assigned its interest in the rental stream to plaintiff. The Court now turns its attention to the subject lease and guaranty.
The subject lease is a finance lease governed by Section 2A of the Uniform Commercial Code (UCC) which has been codified under Missouri law as Section 400.2A-101 et. seq. of the Missouri Uniform Commercial Code (MUCC). Section 2A of the MUCC states in relevant part:
400.2A-102. Scope
This Article applies to any transaction, regardless of form, that creates a lease.
400.2A-108. Unconscionability
(1) If the court as a matter of law finds a lease contract or any clause of a lease contract to have been unconscionable at the time it was made the court may refuse to enforce the lease contract, or it may enforce the remainder of the lease contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

*1060 (2) Before making a finding of unconscionability under subsection (1), the court, on its own motion or that of a party, shall afford the parties a reasonable opportunity to present evidence as to the setting, purpose, and effect of the lease contract or clause thereof, or of the conduct.
400.2A-202. Final written expression  parol or extrinsic evidence
Terms with respect to which the confirmatory memoranda of the parties agree or which otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
(a) by course of dealing or usage of trade or by course of performance; and
(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.
400.2A-301. Enforceability of lease contract
Except as otherwise provided in this Article, a lease contract is effective and enforceable according to its terms between the parties, against purchasers of the goods and against creditors of the parties.
400.2A-302. Title to and possession of goods
Except as otherwise provided in this Article, each provision of this Article applies whether the lessor or a third party has title to the goods, and whether the lessor, the lessee, or a third party has possession of the goods, notwithstanding any statute or rule of law that possession or the absence of possession is fraudulent.
400.2A-407. Irrevocable promises  finance leases
(1) In the case of a finance lease that is not a consumer lease the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods.
(2) A promise that has become irrevocable and independent under subsection (1):
(a) is effective and enforceable between the parties, and by or against third parties including assignees of the parties, and
(b) is not subject to cancellation, termination, modification, repudiation, excuse, or substitution without consent of the party to whom the promise runs.
(3) This section does not affect the validity under any other law of a covenant in any lease contract making the lessee's promises irrevocable and independent upon the lessee's acceptance of the goods.
400.2A-503. Modification or impairment of rights and remedies
(1) Except as otherwise provided in this Article, the lease agreement may include rights and remedies for default in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article.
. . . . .
(3) Consequential damages may be liquidated under section 400.2A-504, or may otherwise be limited, altered or excluded unless the limitation, alteration or exclusion is unconscionable. Limitation, alteration or exclusion of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation, alteration or exclusion of damages where the loss is commercial is not prima facie unconscionable.
Section 400.2A-108 regarding unconscionability is taken almost verbatim from the provisions of Section 400.2-302 R.S.Mo. In the Uniform Commercial Code Comment to § 400.2-302 R.S.Mo., the stated purpose of this section is:
"... for the courts to police explicitly against the contracts or clauses which they find to be unconscionable. In the past such policing has been accomplished by adverse construction and language, by manipulation of the rules of offer and acceptance or by determination that the clause is contrary to public policy or to the dominant purpose of the contract. This section is intended to allow the court to pass directly *1061 on the unconscionability of the contract or particular clause therein and to make a conclusion of law as to its unconscionability. The basis test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. Subsection (2) makes it clear that it is proper for the court to hear evidence upon these questions. The principle is one of the prevention of oppression and unfair surprise [citation omitted] and not of disturbance of allocation of risks because of superior bargaining power.
The present section is addressed to the court, and the decision is to be made by it. The commercial evidence referred to in subsection (2) is for the court's consideration, not the jury's.
§ 400.2-302, Uniform Commercial Code Comment.
After reviewing the parties' pleadings and the evidence submitted in support of and in response to the summary judgment motions, it is clear to the Court that there are no genuine issues as to any material fact regarding the sale(s) and assignment transaction and execution of the subject lease and guaranty by the defendants.
This Court has already determined that the sale(s) transactions regarding the lithotripter unit were proper under applicable Missouri law. Furthermore, the assignment of the rental stream to the plaintiff, by CFS, was also proper under Missouri law.
Both defendants signed the lease proposal in August 1992. The defendants' signatures are on the subject lease and guaranty, dated October 1, 1992. Both defendants' signatures are on the Acknowledgement and Acceptance (of the leased equipment), dated October 21, 1992. Both defendants have admitted during deposition and in their discovery responses that the signatures on these documents are their signatures. Plaintiff's Motion for Summary Judgment, Exhibit 2  Deposition of Defendant Eyerman, pgs. 94-95, 110, Exhibit 10  Defendant Eyerman's Responses to Plaintiff's Request for Admissions, Exhibit 11  Defendant Eyerman's Responses to Plaintiff's First Set of Interrogatories; Exhibit 3  Deposition of Defendant Gursahani, pgs. 7-8, 67-68, 80-81, Exhibit 12  Defendant Gursahani's Responses to Plaintiff's First Set of Interrogatories. The defendants had the use and benefit of the leased equipment from October 21, 1992 until July 28, 1993 when it was repossessed by the plaintiff. Both defendants admit that plaintiff made repeated demands for lease payments; and that in response thereto, defendants made only two payments under the lease.
Both defendants seek to avoid liability for defaulting under the lease on a number of grounds. Both defendants appear to cast aspersions on David Rines' integrity and handling of the leasing arrangement ostensibly on their behalf. Defendant Gursahani goes so far as to accuse his co-defendant and Mr. Rines into tricking him into signing documents which he believed only pertained to a consulting position with regard to the business promotion of the lithotripter unit. He further claims the entire lease is void because a Certificate of Need was not obtained with regard to the leased equipment. Defendant Eyerman has filed a three-count "counterclaim" in which he claims no liability for default because the lease is void since he did not receive a copy of the sales contract regarding the leased equipment, that certain terms were not contained in the final executed lease, and that the lease is unconscionable. After careful consideration of the defendants' defenses, the Court finds each one to be meritless.
Defendant Gursahani contends that he signed the lease and guaranty under "duress" because David Rines approached him with papers to sign while the defendant was "in between operations". He was in a hurry and signed the papers without reading them.
It is well-established under Missouri law that a person who has an opportunity to read a document but signs it without so doing is held to have knowledge of the documents contents, absent a showing of fraud. U.S. for Use of Bussen Quarries, Inc. v. Thomas, 938 F.2d. 831, 833 (8th Cir.1991) *1062 citing Mercantile Trust Co. v. Carp, 648 S.W.2d 920, 924 (Mo.App.1983). It is clear that "a person cannot avoid a written contract on the ground that he did not attend its terms, or that he supposed it was different in its terms, or that it was a mere form." Haines v. St. Charles Speedway, Inc., 689 F.Supp. 964, 968 (E.D.Mo.1988), aff'd 874 F.2d 572 (8th Cir.1989) [quoting Ragan v. Schreffler, 306 S.W.2d. 494, 499 (Mo.1957) ]. A contracting party, who is competent to contract, is presumed to know the contents of the papers s/he is signing and the fact that the contracting party fails to read the papers or does not have someone else read them to her/him does not rebut this presumption. Haines v. St. Charles Speedway, Inc., at 968; Muller v. Mutual Benefit Health & Association, 68 S.W.2d. 873, 882-83 (Mo.App.1934). In order to show that he was fraudulently induced to sign the lease and guaranty (as well as all of the other relevant documents), defendant Gursahani must establish by clear and convincing evidence each of the following elements: 1) a false, material representation; 2) Copelco's (or even CFS') knowledge of its falsity or ignorance of its truth; 3) Copelco's (or even CFS') intent that defendant Gursahani act upon the false representations in a manner reasonably contemplated; 4) defendant Gursahani's ignorance of the statement's falsity; and 5) defendant Gursahani's reliance on the statement's truth and proximate injury. U.S. for Use of Bussen Quarries, at 833 citing Norden v. Friedman, 756 S.W.2d. 158, 164 (Mo.1988).
Defendant Gursahani's defense for fraudulent inducement fails for two reasons. Firstly, he fails to identify any particular statement by David Rines which indicated to him that the papers were anything but lease documents. He claims that Rines approached him when he was in a hurry, introduced himself to the defendant, "waved papers at him", told him that the papers had to do with consulting work that defendant Gursahani had agreed to do, and that the papers had to be signed right away. Defendant Gursahani's Response to Plaintiff's Motion for Summary Judgment, pg. 7. However, at his deposition, Gursahani fails to identify any specific statements made by Rines claiming that the lease papers were a consulting agreement. He simply reiterates his own belief that any papers he signed he thought were related only to "consulting work" because of some conversations he may have had with defendant Eyerman and/or David Rines.
Q. (Attorney Stephens) Did you ever sign a consulting agreement?
A. (Defendant Gursahani) No. I  I felt that I was signing the consulting agreement when I was signing these papers [lease, option to purchase, and guaranty].
--------
Q. Would you please turn to the next page, please, Doctor? That should be a document which says at the top "Lease Proposal"; is that right?
A. Yes.
Q. Does your signature appear on that document? the second page down at the bottom,
A. Yes. I'm just trying to compare it ...
Ms. Simons: Well, the first page is a cover letter, as you see, addressed to you both by it looks like Century Financial Group, and it says that it is attaching a proposal. Okay.
A. Yes.
Q. Now, did you sign this on or about August the 4th of 1992?
A. Yes.
Q. And what is your understanding of this document?
A. That I'm being hired as a consultant to this project.
Defendant Gursahani's Deposition, pgs. 24, 47.
Defendant has failed to provide this Court with clear and convincing evidence that any false representations were made to him regarding the nature of any of the documents he signed, especially with regard to the lease and guaranty. Furthermore, assuming arguendo that false representations were made to him about the nature of the entire transaction or the contents of the documents he signed, defendant's entire evidence implicates Mr. Rines (as well as his co-defendant). Defendant has not offered one shred of evidence that Mr. Rines had any connection to the plaintiff or that any authorized representative *1063 of the plaintiff made false representations to him in order to induce him to sign the documents. Defendant Gursahani is quite explicit as to whom he blames for his predicament.
"Gursahani had no reason at all to suspect that Rines would deceive him. He knew, because Eyerman had told him, that Rines would be bringing him papers to sign relating to his consulting work. He knew that Rines was working on the new project with Eyerman, and that they had been involved in other business transactions in the past. He trusted Eyerman as a man he knew professionally for many years and had no reason to think that Rines, who was his agent, could be deceiving him. (Affidavit, Exh. 2)."
Defendant Man Mohan Gursahani's Response to Plaintiff's Motion for Summary Judgment (# 60), pg. 10.
Whether the defense of duress is available on the facts, as alleged by defendant Gursahani, is a question of law. Schmalz v. Hardy Salt Co., 739 S.W.2d. 765, 768 (Mo.App.1987). In order to claim duress in avoiding the enforcement of a contract, a person must be so oppressed from the wrongful conduct of another as to deprive him of free will. Schmalz, at 768 citing Wolf v. St. Louis Public Service Co., 357 S.W.2d. 950, 954-55 (Mo.App.1962); see also Haines v. St. Charles Speedway, at 969. The party tendering the contract must have engaged in some wrongful act which rendered the contracting party unable to exercise his free will. In the instant case, all defendant Gursahani claims is that Rines approached him when the defendant "was in a hurry" due to his medical obligations. He does not claim that he asked to read the documents prior to signing and that this request was denied. He does not even claim that Rines demanded that he sign the papers right then and there or else the lithotripter project was in jeopardy. All Gursahani claims is that he was in a hurry and that Rines said the papers had to be signed right away. Defendant Gursahani has failed to allege or provide any evidence to support facts which indicate that he signed the lease and guaranty under duress. There is no legal basis for a duress defense to the lease and guaranty.
Gursahani next contends that the lease is void because a Certificate of Need was never issued by the State of Missouri. This fact is totally irrelevant to this cause of action.
In Missouri, "[a]ny person who proposes to develop or offer a new institutional health service within the state must obtain a certificate of need from the committee [Missouri Health Facilities Review Committee] prior to the time such services are offered." § 197.315(1) R.S.Mo. Section 197.305(11)(b) defines New institutional health service as "[t]he acquisition, including acquisition by lease, of any health care facility, or major medical equipment costing in excess of the expenditure minimum". Section 197.305(6) provides that the expenditure minimum for the acquisition of major medical equipment is $400,000.00. Chapter 19 CSR 60-50.011 defines the term "cost" as "[w]hen the acquisition is by way of lease, to the price the owner paid to purchase a health care facility or major medical equipment ...".
Both defendants argue that facts are in dispute as to the actual value of the leased equipment; and that the lease is voidable because a Certificate of Need (CON) was never issued (prior to repossession). These are nothing more than red herrings.
While it is true that the Committee requested a great deal of information from Mr. Rines once he had notified them of the purchase and lease of the lithotripter unit, there is no indication that this information was requested because the Committee had determined that the lithotripter unit required a CON. The Court cannot fathom why the Committee requested all the information that it did. It is interesting to note that while the Committee was requesting the additional information, at no time did it inform any of the parties (i.e. plaintiff, CFS, or the defendants) that the lithotripter unit could not be used.
Missouri statutes and regulations clearly establish an cost threshold for the issuance of a CON. This threshold is $400,000.00 based upon the purchase price. The defendants have failed to cite to the Court any Missouri *1064 statute or regulation that mandates actual value as the threshold standard. In the instant matter, all the documents clearly show that the lithotripter unit was first sold for $300,000.00; and then sold for $399,000.00. It doesn't matter if the intentions were to keep the purchase price below $400,000.00 in order to meet the threshold requirement. If the parties to the sales transactions agreed to these prices, so be it. Any other costs, such as the fee to CFS, were incidental to the purchase price.
Furthermore, the defendants have failed to cite to the Court any Missouri statute, regulation, or caselaw which stipulates that a lease is voidable because a CON was not issued for acquisitions meeting the CON requirements. Section 197.315(1) R.S.Mo. simply requires a CON (when required) "prior to the time such services are offered". Nowhere is it stated that a CON is required prior to the time major medical equipment is purchased or leased. As stated before, at no time were the defendants notified that they could not use the lithotripter unit because a CON had not been issued.
As for defendant Eyerman's "three-count counterclaim", the Court agrees that these are simply defenses raised to avoid the enforcement of the lease. Defendant Eyerman has failed to demonstrate any cause of action upon which these "counts" could be maintained. The Court finds that these "counts" do not state any claims upon which relief can be granted; instead, they simply assert specific grounds upon which the defendant seeks to avoid liability under the lease. Since the Court finds that defendant Eyerman is mistaken in his designation of these defenses as separate counts of a single counterclaim, the Court will simply treat the pleading as if there had been a proper designation. Rule 8(c) Fed.R.Civ.P.
Defendant Eyerman's first "count" is premised upon the plaintiff's alleged failure to provide him with the sales contracts and other documents relating to the purchase of the leased equipment. He alleges that he has never received any documents relating to the purchase of the leased equipment.
It is undisputed that defendant Eyerman signed the subject lease. Paragraph 3 of the executed lease clearly states that "Lessee acknowledges that Lessor has provided Lessee with a copy of the contract evidencing Lessor's purchase of the Equipment and that Lessee's acceptance of the Equipment was not induced by any assurances of Lessor." (emphasis added). Defendant Eyerman asserts that plaintiff has the burden to show that Eyerman was in fact provided with a copy of CFS's sales contract. Defendant is grossly mistaken in this assertion. Since it is undisputed that defendant Eyerman signed and executed the lease, and the lease clearly provides an acknowledgement by the defendant that he had been provided a copy of the sales contract (pertaining to CFS), defendant's defense must fail.
The Court also notes that in this "count" defendant states that under the lease he was to be provided with "all contracts and documents relating to the purchase of the leased equipment, including information as to the origin of the leased equipment, its original cost and the amount of all commissions, fees, mark ups, and other payments paid to others." The defendant has failed to identify where in the lease, i.e. section, subsection or paragraph, this expansive disclosure is mandated. The Court has carefully reviewed the lease and cannot locate any statement which comes close to requiring the provision of these documents by the Lessor or the plaintiff. Furthermore, since under Paragraph 3 of the Lease, the defendant acknowledges that he has selected both the equipment and the supplier, it is puzzling how the defendant cannot now assert as a defense that he was not provided with information regarding the origin of the leased equipment.
Defendant Eyerman's second "count" is premised upon the allegation that the executed lease differs from the lease proposal in lease term and deferral of payments. Defendant contends that CFS, "in concert with or on behalf of Copelco, induced Eyerman to enter into the lease by representing that no payments were to be due for the first three months of the lease." Eyerman seeks to introduce parole evidence to support his contention that he thought the *1065 terms contained in the lease proposal would be the final lease.
The lease proposal is clearly identified as a "preliminary proposal". It unequivocably states that the provisions contained in the proposal do not constitute a commitment by CFS to accept the transaction; and that the preliminary proposal is subject to final approval by the Senior Management Committee of CFS. Furthermore, although the defendants signed the preliminary proposal, no authorized representative of CFS signed the proposal.
On the other hand, CFS and the defendants signed and executed the final lease. The lease clearly states that the lease term is 48 months. Paragraph 5 of the lease states that "[t]he first payment shall be due on execution and delivery of this Lease to Lessor."
The Court agrees that the parole evidence rule excludes any statement or evidence that defendant Eyerman seeks to offer which would alter or change the terms of the lease. Paragraph 25 of the lease provides that "[t]his instrument constitutes the entire agreement between the Lessor and Lessee. No provision of this Lease shall be modified unless in writing signed by an authorized representative of Lessor." Defendant contends that Paragraph 25 only prohibits oral modification of the lease. He provides absolutely no support for this contention. Not only does Paragraph 25 of the lease support application of the parole evidence rule in the instant matter, but so does § 400.2A-202. Section § 400.2A-202 governs application of the parole evidence rule in matters involving leases such as the present one. It clearly prohibits the introduction of any evidence which contradicts the terms of a final agreement. Since the defendant signed and executed the lease, and Paragraph 25 clearly articulates the lease as a final expression of the agreement between Lessor (CFS) and Lessee(s) (the defendants), § 400.2A-202 prohibits the introduction of evidence of any prior agreement (i.e. the lease proposal) or of the circumstances surrounding the signing of the lease. This defense must also fail.
Defendant Eyerman's final "count" is a little vague but it appears that he is asserting that the alleged failure of the plaintiff to provide him with the list of documents, as contained in his first "counterclaim", renders the lease unconscionable.
Eyerman fails to provide any support for his contention that failure to provide collateral documents renders a lease unconscionable. As noted before, the only document defendant was entitled to receive was a copy of the sales contract executed by CFS, and defendant signed and executed the lease acknowledging that he had been provided this document. Furthermore, the defendant is a well-educated man presently actively involved in his own successful medical practice.[4] The lease clearly expresses the terms and conditions in plain English, and the defendant has offered no evidence that he was unable to read and understand the lease, as written, at the time he executed it. The Court has carefully reviewed the contents of the lease and finds no clause which renders the lease so "one-sided" so as to be oppressive and/or surprising to the defendant. This lease is neither in part or in whole unconscionable.
It is undisputed that the defendants executed the subject lease and guaranty, executed the acknowledgement and acceptance form, obtained possession of the leased equipment, and made only two late payments in response to demand letters from plaintiff prior to the repossession of the leased equipment. By signing and executing the lease, the defendants agreed that they would have no claim for consequential or incidental damages against the Lessor; and they further agreed that any assignee of the lessor would have all of the rights of the Lessor but none of the Lessor's obligations. Finally, the defendants agreed to any assignment of the lease by the Lessor and that they would not assert against the assignee any defense or counterclaim that they may have against the Lessor. The fact that the defendants offer *1066 their deposition testimony to demonstrate their lack of full appreciation of the intricacies of the sales and lease transaction, as well as their failure to attend to the contents of the documents they were signing, does not alter the Court's findings. The depositions of the other parties involved in this transaction, copies of faxes sent to the defendants, as well as their admission of executing the lease proposal three months prior to executing the lease, demonstrates to the Court that the defendants were aware of the various transactions being contemplated and carried out with the goal of consummating the subject lease. Missouri law is clear that educated professional persons such as the defendants are held accountable for their performance under a valid contract, whether or not they have taken the time to read and understand the contents of said contract.
As a final consideration, the Court notes that neither of the defendants contend that the Guaranty is voidable or unenforceable. Under the guaranty, the defendants have clearly unconditionally bound themselves to guaranteeing their performance as Lessee(s) under the subject lease. In the guaranty, the defendants unequivocably waived (as guarantors) any defenses they may have had as lessees. Consequently, there are no issues of material fact as to the defendants' liability in this matter as the guarantors on the subject lease, and thus, the plaintiff is entitled to judgment as a matter of law on this point alone.
Having found that there is no genuine issue of material fact as to the validity and enforceability of the subject lease and guaranty, plaintiff is entitled to summary judgment as a matter of law regarding Copelco's complaint and defendant Eyerman's three-count counterclaim.
NOTES
[1] The Court is unclear as to the status of Count III since subsequent to the filing of the complaint, the plaintiff did in fact repossess the subject equipment. It appears that Count III may now be considered moot.
[2] The facts of this case are extracted from the numerous attachments filed by the parties in support of and in response to the summary judgment motions. These attachments include portions of the deposition testimony of several people (including the defendants), affidavits of plaintiff's representatives in connection with the events of this case; copies of documents relevant to this case, including but not limited to, bills of sale, the subject lease, the subject guaranty, title applications, and correspondence. For the sake of brevity, the Court will only reference a specific document when necessary in order to highlight a particular fact.
[3] The lithotripter in question is described in the submitted documents as a complete Dornier lithotripter model HM-3 (serial number 610250) housed in a 1986 Miller transportable mobile suite # 1 MLV 54829GB061003 complete with the Philips radiographic system.
[4] Defendant Eyerman is a practicing neurologist, defendant Gursahani is a practicing urologist. Both defendants have been involved in prior business deals involving medical equipment, some involving the lease of medical equipment, especially defendant Eyerman. Defendant Eyerman's Deposition, pg. 9.